# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 21-1786C
(May 21, 2024)

|  |  |
|---|---|
| **TRIUMPH FINANCIAL SERVICES LLC** (d/b/a Triumph Business Capital), <br><br> *Plaintiff,* <br><br> v. <br><br> **UNITED STATES**, <br><br> *Defendant.* | ) ) ) ) ) ) ) ) ) ) ) ) ) |

*Michael J. Schrier*, Husch Blackwell LLP, Washington, DC, for plaintiff. With him on the briefs were *Jared A. Ullman* and *Michael W. Ullman*, Ullman & Ullman, PA, Boca Raton, FL.

*A. Bondurant Eley*, Senior Litigation Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER[1]

***BONILLA, Judge***.

This case arises from the United States Postal Service's (USPS) alleged non-payment of over $200 million to plaintiff Triumph Financial Services LLC (d/b/a Triumph Business Capital) [hereinafter "Triumph"] in connection with the purported assignment of invoice payments due under transportation service

---

[1] This case was transferred to the undersigned for adjudication on February 28, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC). The parties have engaged in discovery since March 16, 2022. Briefing on the dispositive motion resolved herein was completed on April 5, 2024. Oral argument was heard on May 21, 2024.

contracts between USPS and two third parties. Pending before the Court is defendant's motion for partial dismissal (ECF 86). For the reasons below, the motion is GRANTED.

## BACKGROUND

Prior to the events giving rise to this suit, nonparties Postal Fleet Services, Inc. (PFS) and Stageline Company (Stageline) separately entered into freight motor carrier transportation service contracts with USPS under the agency's Dynamic Route Optimization (DRO) initiative.[2, 3] Thereafter, on June 1, 2018, PFS entered into a factoring and security agreement with Covenant Transport Solutions, LLC (d/b/a Transport Financial Solutions) [hereinafter "Covenant"], wherein PFS assigned its USPS accounts receivable to Covenant in exchange for advance payments (less a commission and fees). On March 23, 2020, Stageline and Covenant entered into an identical factoring and security agreement. After the financial arrangements were executed, and continuing through June 2020, USPS reportedly remitted payment of PFS's and Stageline's invoices directly to Covenant.

Following a July 2020 portfolio acquisition, Covenant reassigned its PFS and Stageline invoicing and collection rights to Triumph where, under the same factoring agreements, Triumph was responsible for making advances to PFS and Stageline. Around this time, Triumph entered similar factoring arrangements with eight other USPS transportation service contractors.[4] On July 22 and 24, 2020, Triumph notified USPS of its financial acquisitions and reassignments under the aforementioned factoring agreements and requested direct payment of all future invoices related to the ten contractors, including PFS and Stageline. From August through September

---

[2] PFS later acquired Stageline. Although both entities are managed by PFS's corporate headquarters, they continue to operate independently.

[3] According to a September 27, 2019 audit performed by USPS Office of Inspector General:

> The Postal Service began implementing the [DRO] initiative in fiscal year (FY) 2016. The initiative allows for morning Highway Contract Routes (HCR) to change from a fixed-price contract with set routes (static) to a rate per mile (RPM) contract with varying departure times, lines of travel, and mail types transported based on mail volume (dynamic) to optimize routes thus reducing mileage and transportation costs. The Postal Service awards DRO contracts for sites selected for conversion and uses Commercial Off-the-Shelf Transportation Management System (TMS) software in conjunction with the Shipment File Web application to generate weekly dynamic manifests at the DRO sites.
>
>     . . .
>
> In FY 2018, the Postal Service spent about $4.32 billion on HCR transportation and drove about 1.6 billion miles.

*See* https://perma.cc/9KD5-BNX6 (last visited May 21, 2024).

[4] The transportation service contractors included: Williams Mail Service, W & L Mail Service, Inc., Thunder Ridge Transport, Inc., Ursa Major Corporation, Sheehy Mail Contractors, Inc., Courtlandt and Brown Enterprises, LLC, W. E. Graham Trucking, and Hi-Pro, Inc. *See* ECF 6 at ¶ 21.

2

2020, in response to and in accordance with Triumph's notices of reassignment, USPS made nearly 1,000 payments to Triumph on the PFS and Stageline transportation service contracts in the aggregate amount of over $35 million.

In September 2020, a finance executive purporting to represent PFS and Stageline contacted USPS officials and requested that future invoice payments be remitted to the contractors rather than Triumph. Assuming Triumph's awareness, USPS rerouted the payments to PFS and Stageline effective October 1, 2020. After discovering the missing payments, Triumph contacted USPS on October 8, 2020, threatening litigation and requesting an immediate meeting between all parties to resolve the payment issues. USPS reinstated the payments to Triumph the next day.

According to Triumph, to leverage the reversion of direct payments, PFS and Stageline next warned of (or threatened) a likely disruption in mail delivery leading up to the November 3, 2020 presidential election and the upcoming holiday season. After internal deliberations, USPS reversed course and redirected the transportation service contract payments to PFS and Stageline in late October 2020. By letter dated October 22, 2020, USPS officials explained to Triumph: USPS and Triumph were not in privity of contract, any invoicing and collection reassignments from Covenant to Triumph were in direct violation of the terms of the original assignment, and Triumph failed to comply with the standard terms of USPS's Assignment Clause. Between October 2020 and May 2021, USPS remitted over $200 million in contract payments directly to PFS and Stageline. Notwithstanding the foregoing, USPS made over $325 million in payments directly to Triumph in connection with the other eight transportation service contractors during that time.

After reportedly failing to recover the advance payments and agreed upon commission and fees from PFS and Stageline in federal district court, Triumph commenced this action against USPS on September 1, 2021.[5, 6] The original one-count complaint asserted a breach of the payment obligations due Triumph as assignee of USPS transportation service contracts. By leave of the Court, Triumph filed an amended complaint on November 3, 2023, pleading additional and alternative theories of entitlement to relief. Triumph specifically alleges a breach of contract as

---

[5] Triumph filed suit against PFS and Stageline in the United States District Court for the Western District of Tennessee on November 24, 2020. *See Advance Bus. Cap. v. Postal Fleet Servs., Inc.*, No. 20-2859 (W.D. Tenn.). On December 1, 2020, the district court issued a temporary restraining order (TRO) requiring that PFS and Stageline hold in trust all USPS proceeds purportedly reassigned to Triumph. Three weeks later, the district court denied Triumph's request for a preliminary injunction and dissolved the TRO. Thereafter, on June 16, 2021, the parties entered into a nonpublic Litigation Abatement Agreement and Release and the case was administratively closed. During oral argument, Triumph represented that it did not recover payment from either PFS or Stageline in connection with that litigation.

[6] Prior to commencing this action, Triumph filed suit against USPS on December 3, 2020, in the United States District Court for the Southern District of Florida seeking declaratory relief. *See Advance Bus. Cap. LLC v. United States*, No. 20-82216 (S.D. Fla.). The parties filed a joint stipulation of dismissal without prejudice on August 5, 2021. *See id.* (ECF 34).

a successor-in-interest or assignee (Count I) and a violation of the Anti-Assignment Act, citing 31 U.S.C. § 3727(c) and 41 U.S.C. § 6305(b) (Count II)[7] or, alternatively, a violation of Section 9-406(a) of the Uniform Commercial Code (UCC). Triumph seeks over $63 million in damages.

## DISCUSSION

Pending before the Court is defendant's motion for partial dismissal under RCFC 12(b)(1) and 12(b)(6). Defendant first asserts Triumph's claims of equitable subrogation to evoke privity of contract with USPS in Count I are implausible and, thus, outside this Court's limited jurisdiction. Second, defendant argues the Anti-Assignment Act does not apply to USPS and, accordingly, Count II fails to state a claim upon which relief can be granted. Third, defendant contends Triumph's alternative theory of recovery under the UCC similarly fails to state a claim upon which relief can be granted since the UCC does not apply to federal contracts.

In response, Triumph disavowed any equitable subrogation argument and likewise renounced a substantive UCC claim, explaining its reference was intended to aid in the interpretation of relevant terms.[8] As such, the remaining issue before the Court is defendant's RCFC 12(b)(6) motion, centered on the Anti-Assignment Act and, more precisely, whether it applies to USPS. It does not. Accordingly, defendant's motion for partial dismissal is GRANTED.

### I.   Legal Standard

When considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), courts "must accept as true all the factual allegations in the complaint, and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted). "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (internal quotation marks omitted) (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)). In performing this assessment, however, assertions of legal conclusions are not credited, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to

---

[7] The Anti-Assignment Act consists of two statutory provisions: 31 U.S.C. § 3727 (Assignment of Claims Act) and 41 U.S.C. § 6305 (Prohibition on transfer of contract and certain allowable assignments). *See Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002). Despite citing both statutes in its amended complaint, Triumph now concedes 31 U.S.C. § 3727 is inapplicable to this case.

[8] Triumph only referenced subrogation at four points in its amended complaint, each time as an alternative to assignment. *See* ECF 67 at ¶¶ 11, 30, 68, 80. Likewise, Triumph did not independently plead a claim under the UCC, but rather suggested "this Court could apply universally accepted principles under the Uniform Commercial Code as generally adopted under federal common law." *See id.* ¶ 67 n.4.

4

merely a conceivable–claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

## II.   Anti-Assignment Act

In Count II of its amended complaint, Triumph alleges USPS violated the Anti-Assignment Act in failing (or refusing) to pay Triumph over $200 million for the transportation services rendered by PFS and Stageline between October 2020 and May 2021. In support, Triumph alleges its payment rights were duly assigned with proper notice to (and initial acceptance by) USPS. The government moves to dismiss Triumph's claim under RCFC 12(b)(6), arguing that the Anti-Assignment Act does not apply to USPS in light of the Postal Reorganization Act (PRA), Pub. L. No. 91-375, 84 Stat. 713, 725 (1970), which generally proscribes: "no Federal law dealing with public or Federal contracts . . . shall apply to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a).

Dating back to the American Civil War, the Anti-Assignment Act was principally enacted "to prevent frauds upon the Treasury of the United States" by, for example, "prevent[ing] persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government." *See United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 373 (1949). Particularly relevant here is Congress' secondary reason for the Anti-Assignment Act: "to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant." *United States v. Shannon*, 342 U.S. 288, 291 (1952) (quoting *Aetna*, 338 U.S. at 373).

Title 41, United States Code, Section 6305 generally proscribes the transfer of government contracts or any interest thereunder to a third party. *See* 41 U.S.C. § 6305(a) ("The party to whom the Federal Government gives a contract or order may not transfer the contract or order, or any interest in the contract or order, to another party."). Under this provision of the Anti-Assignment Act, a codified exception exists to allow for a government contractor's assignment of accounts receivable "to a bank, trust company, Federal lending agency, or other financing institution" that further meets certain criteria. 41 U.S.C. § 6305(b)(1). Even assuming Triumph qualifies as a "financing institution" under the statute, the Court more broadly holds that the Anti-Assignment Act does not apply to USPS.

The PRA generally exempts USPS from the body of federal contract law:

> Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.

5

39 U.S.C. § 410(a). Subsection (b), in turn, includes applicable federal civil rights laws, record retention and disclosure requirements, employee conduct and safety rules, and criminal statutes. *See id.* § 410(b)(1)–(11); *see Bacashihua v. United States*, 811 F.2d 1498, 1501 (Fed. Cir. 1987) ("The PRA established the Postal Service as an independent establishment of the executive branch *with very limited application of federal employee law.*") (emphasis added; citation omitted). Because these statutes apply to public and private entities alike, USPS's post-1970 continued adherence aligns with Congress' intent to transform the former United States Postal Department into a commercial entity. *See Banks v. Merit Systs. Prot. Bd.*, 854 F.3d 1360, 1362–63 (Fed. Cir. 2017) ("In the PRA, Congress sought to recast the operation of the [P]ostal [S]ervice in a business-like way . . . .") (internal quotation marks and citation omitted).

Moreover, where § 410(b) references Title 41 (Public Contracts), the cites are limited to Chapter 65 (Contracts for Materials, Supplies, Articles, and Equipment Exceeding $10,000) and Chapter 67 (Service Contract Labor Standards). *See* 39 U.S.C. § 410(b)(5). There is no corresponding reference to Chapter 63 (General Contract Provisions), let alone a citation to the Anti-Assignment Act, 41 U.S.C. § 6305. Invoking Occham's razor: The simplest answer is usually correct. There is no reason to tortuously read into the PRA that which is not there. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

Although the Federal Circuit has not yet ruled upon this specific issue, the decision reached today aligns with existing precedent. In addressing the scope of the exceptions to § 410(a), the appellate court has interpreted the statutory listing in subsection (b) literally. *See, e.g.*, *Erickson v. U.S. Postal Serv.*, 759 F.3d 1341, 1347 (2014) ("The Back Pay Act is not enumerated in 39 U.S.C. § 410(b). That Act therefore does not apply generally to the Postal Service."); *Nigg v. Merit Sys. Prot. Bd.*, 321 F.3d 1381, 1384 (Fed. Cir. 2003) ("The Board correctly held that the [Law Enforcement Availability] Pay Act does not apply to the Postal Service. The provisions of Title 5 do not apply to the Postal Service unless Congress has specifically so provided. *See* 39 U.S.C. § 410 . . . Section 5545a is not one of the exceptional provisions that Congress had made applicable to the Postal Service. *See* 39 U.S.C. § 410(b)."). The Court finds no basis to depart from the Federal Circuit's consistent interpretation of the PRA in analogous cases. Furthermore, in *Spodek v. United States*, 46 Fed. Cl. 819 (2000), this Court squarely held that the substantively identical statutory predecessor to the current Anti-Assignment Act (i.e., 41 U.S.C. § 15(a) (1994)) "does not apply to the USPS." 46 Fed. Cl. at 825. While the underlying facts in *Spodek* are distinguishable,[9] the statutory framework analysis is not. Indeed, it models the approach adopted by the Court today. *See Spodek*, 46 Fed. Cl. at 824–25.

---

[9] *Spodek* involved USPS's right to collect monies owed by a contractor through offsets on unrelated rent owed to that contractor following the assignment of the rental payments to a third party. *See*

6

Seeking to avoid the logical extension of this precedent, Triumph attempts to distinguish § 410(a)'s concluding reference to "the exercise of the *powers* of the Postal Service" from Triumph's claim that USPS had a *duty* (or obligation) to continue honoring Covenant's reassignment of PFS's and Stageline's accounts receivable. While facially interesting, this argument lacks merit. Title 39, United States Code, Section 401, lists the following "General powers of the Postal Service:"

> (3) to enter into and perform contracts, execute instruments, and determine the character of, and necessity for, its expenditures; [and]
>
> . . .
>
> (10) to have all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers.

39 U.S.C. § 401. USPS's decisions regarding whether, how, and to what extent to remit payments on transportation service contracts clearly fall within these enumerated general powers. To this end, it is not lost on the Court that Triumph's principal (and now remaining) claim is for breach of contract.[10]

## CONCLUSION

For the reasons set forth above, defendant's motion for partial dismissal (ECF 86) is GRANTED. Accordingly, the Clerk of Court is directed to DISMISS Count II of plaintiff's amended complaint (ECF 67). Defendant shall FILE an answer on or before June 4, 2024, pursuant to RCFC 12(a)(4)(A)(i).

---

46 Fed. Cl. at 823–24. The Court ultimately concluded that because the Anti-Assignment Act, 41 U.S.C. § 15 (1994) (predecessor to 41 U.S.C. § 6305), does not apply to USPS, the codified setoff restrictions are inapplicable. *See Spodeck*, 46 Fed. Cl. at 825–27.

[10] Triumph's citation to an unpublished decision from the United States District Court for the Central District of California in *Lea v. United States*, No. 23-cv-04425, 2023 WL 4685964 (C.D. Cal. July 21, 2023), is misplaced. Indeed, the district court in *Lea* summarily stated that applying the Assignment of Claims Act, 31 U.S.C. § 3727, would not affect USPS's exercise of its powers because § 3727 "simply concerns the rights of *third parties* doing business with the Postal Service." *See Lea*, 2023 WL 4685964, at *4 (emphasis added). As noted *supra*, Triumph concedes that the Assignment of Claims Act is inapplicable to this case. Further, the statutory provision of the Anti-Assignment Act at issue in this case, 41 U.S.C. § 6305 (Prohibition on transfer of contract and certain allowable assignments), is fundamentally different from the Assignment of Claims Act because it governs *both* third-party behavior *and the actions and rights of the government*. *See* 41 U.S.C. § 6305(a) ("A purported transfer in violation of this subsection annuls the contract or order so far as the Federal Government is concerned, except that all rights of action for breach of contract are reserved to the Federal Government."); *see id.* § 6305(b)(3)–(4) ("Assignment [or reassignment] may not be made under this subsection if the [original government] contract forbids the assignment. . . . [or] [u]nless otherwise expressly permitted by the [original] contract.").

It is so **ORDERED**.

                                                          Armando O. Bonilla
                                                          Judge